all. Good morning, your honor. My name is Dorsey Baker. With me at the council table is Fernando Bustos. From Lubbock, we represent the appellate. Counsel, my ears are bad today, and you're going to have to talk up higher and louder if you want me to hear. I certainly do want you to hear, your honor, and I will try to do that. May it please the court. I'm sorry. Is that the one? I think that's the one. That's not the right one, Maria. The other one. This one. Thank you.  You may be seated. In the past, this court has repeatedly determined and stated that judicial admissions and responses to request for admissions under Rule 36 are conclusively established for the entire purposes of the lawsuit. In this case, there were over 20 responses to requests for admissions that were admitted. There were numerous judicial admissions in the pleadings of the defendants Wilson and Lack. However, not one of those 20 admissions and judicial admissions found its way into the findings of fact of the trial court below. Now, those requests for admissions and the conclusions of the admissions that were judicial admissions are scattered throughout the record in this case, but in an effort to facilitate this court's determination, I've gone through the record. I have compiled the 20 judicial admissions that were referred to in our briefs. I have copied them. I would like to hand them up to the court. All right. Please give them to the court. Thank you. Not much information. Now, counsel, tell me right off the bat, were these incorporated by the trial judge in his findings of fact and conclusions of law? There is not a single one of these judicial admissions to be found in the 62 findings of fact of the court below. Now, I'd like to draw the court's attention particularly to one particular judicial admission. It occurred in the pleading of the defendant Wilson. It's on the second page and it's paragraph number 62 of the second amended answer of the defendant Wilson. It's a long one, but I'd like to read the entirety of it into this record because it contains several conclusive admissions that are determinative of this lawsuit. Given notice of Hunn's impending breach of the agreement to draft the drawings in a timely manner and that no one at Hunn Design had any knowledge relating to the drawings in process, Dan Wilson Holmes, Inc. determined that the best course of action was to pay lack to complete the two drawings that were nearing completion while paying Hunn Design the rate previously agreed upon as if Hunn remained employed at Hunn and to fairly compensate Hunn Design for any work performed on the drawings that were not near completion. This course of action was necessary to protect the interest of Dan Wilson Holmes and would leave Hunn Designs in a better position than if, A, lack remained employed at Hunn Design, B, if another Hunn Design employee completed the drawings, C, if Dan Wilson Holmes retained another drafting company to complete the drawings. Now, going through that rather slowly, that is a clear admission that my client breached no agreement. It was only a, quote, impending breach. It had not occurred and did not occur. What did occur, though, was a complete repudiation of the agreement by Dan Wilson. It was Dan Wilson who determined that the best course of action was to pay lack, the former employee, to complete the two drawings in question, and that was his course of action that he determined, I submit it was a clear repudiation by Dan Wilson of the contracts at issue. That's a judicial admission. It never made it to the findings of the district court. Did Dan Wilson Holmes pay Hunn Design the rate previously agreed upon as if lack remained employed? I'm sorry, Your Honor. Did Dan Wilson pay for the entire job to Hunn? I think the answer is no. That is a point of contention. They clearly offered a check of $10,000 to pay for partial work. But not for the completion of the entire project. That is our position. I believe there was oral testimony to that effect. Didn't the district court, though, find that Wilson made this offer to Hunn and Hunn said, I can't do the work or can't do it timely so that the work can be done? That's what the court found. Isn't that right? Not quite, Your Honor. Let me explain. The statement in the pleading of Wilson was that he asked my client when he was going to get them finished. My client responded saying, and I believe this is a correct quote, I don't know when I can get them done, close quote. That was all that was said by my client. Now, bear in mind, the employee had just left. He had 16 residential design contracts that he was supposed to be working on. He left all 16 for my client to go to each homeowner, figure out, well, what's critical? What do I do next? How do I accommodate all of my clients? The evidence is my client accommodated every one of them except for Dan Wilson, who repudiated that contract. Well, but didn't Wilson provide testimony that Hunn said he couldn't finish them timely so that it pretty much forced Wilson to go do something else? First of all, Your Honor, again, I'm telling you that is contrary to their pleading. All right, but was there evidence of that? Yes, there was evidence. Okay. There was oral testimony. Okay. And my point in this whole matter is, Your Honor, that this court has repeatedly said the district court cannot ignore conclusively established findings or admissions or judicial admissions in favor of oral testimony. So what do you think? I didn't understand what you find here that's inconsistent with that version that Wilson came up with at trial. Well, the first thing, if you look at the district court's decision, at paragraph 13, he says Wilson did not breach the contracts. That's a finding of the district court. If you go to this judicial admission of paragraph 51, it's to the contrary. Wilson repudiated the contract. He engaged why? To go into competition with my client. It's what we might call in law school an efficient breach, where he decided that he would go and get it done. And I'm not saying that that makes it okay. This is just a concept. He decided that he would go ahead and do something different before waiting for Hunt to breach. Well, according to this pleading, he decided he would take his own course of action for two reasons. One is the people remaining at my client were not familiar with the homeowners or the designs in progress. So he wanted to take the contract and give it to Hunt. That's one reason. The second reason was that he was concerned with a, quote, impending breach. I understand that. That was not necessarily an unfriendly question. It's undisputed that Dan Wilson Holmes' people knew that there was a non-compete, correct? It's undisputed that they knew there was a non-compete between Lack and Hunt, correct? Your Honor, I don't know that. I believe the testimony at trial was that Mr. Wilson did not know about the non-compete. He did not know about the non-compete. He did not know about it. That was the testimony. So he was completely in the dark. So if Mr. Lack was violating his non-compete, he was not aiding and abetting in that in some way because he didn't know about it? Is that the position of Mr. Wilson's company? Your Honor, to completely answer your question, I think there's two aspects of it. When you say he did not participate, the participation that is wrong here is the engagement of Lack, who stole my client's drawing. I'm not in disagreement with you on that, counsel, for the purpose of the question. I'm just wondering if it shows undisputed evidence at trial, and I'll ask the other side that question. Where can we go in the record to find out, to look at the plans that were delivered to Dan Wilson Homes, to compare them, to determine if they were substantially similar to the as-built or the built plans? Where do we go in the record for that? Because we have to do this substantially similar analysis ourselves to determine if it was clearly erroneous or not. And I want to know where do I go in the record to get the plans so I can compare them. I'd like to really direct your attention to that, to answer that one. First, our position is there was a judicial admission they were substantially similar. Okay. Now, let me explain. First of all, if you go back to this paragraph 62, Dan Wilson says there were two drawings, and that was the Brown residence and the McKee residence, that were near completion. That's what they finished. I submit to this court that that judicial admission of near completion is totally equivalent to substantial similarity. Okay. I'll take that as your first argument. That's my first answer to that. My second answer is that we have included in your excerpts comparisons side by side which this court has asked for, which this court has said to be determinative of the issue of substantial similarity. Okay. And those are the definitive documents we're supposed to use. I thought there was some dispute about that. Those are the documents that we're supposed to use, the ones in the record excerpts side by side. Yes, sir. That gives you the side by side, and you will see there that if you look at the overall form, which is a part of the definition of an architectural design, it says you look at the overall form, the composition of spaces, and the overall arrangement. Our position is that no rational person could conceivably come to a conclusion that there was not deliberate plagiarization. They copied it. Did your client give the AutoCAD software to Lack? I'm sorry? Did Mr. Lack take your company's AutoCAD software? I know he had a different version at home that may have been his own home version, but did he take your 8.0 or your 6.0, one of them? There's two different versions. Our complaint there, Your Honor, is he took the files that were developed. I know, but did he also take the software? I do not believe he took our software. He had his own software, and he converted your file to fit with his software, and that's undisputed. That's correct. Okay. So there's one other thing I'd like to quickly draw the attention of this Court, is the fact that the district court below really was totally confused about copyright law. About what? It was totally confused about copyright law. And the findings of the district court really compel that conclusion. It says these ideas and the concepts were intellectual property. Look, since Baker v. Selden in 1888, we started the idea-expression dichotomy. It's been in every Copyright Act since then. And Section 102B says that ideas and concepts are specifically excluded from a copyright or for the registration. The district court never got that fundamental idea. And as a result, this judgment cannot stand. We're asking this court to reverse and to render. Everything is stated in the briefs. There's clear infringement. We're entitled to what's called a builder's fee, and we ask the court to reverse and render. Okay. Thank you, Your Honor. We have some time left for questions. Mr. Sanford? Ten minutes, yes. May it please the Court. My name is Marion Sanford. I'm counsel for the Wilson Appellees, Dan Wilson and Dan Wilson Homes, Incorporated. There's also counsel for Ben Lack here. This is Elizabeth Hill, who's going to take the last ten minutes of this 20-minute section. I've had a lot planned I want to talk about, but I'd really like to address some of the things that were just spoken about first. First, there was this comment that the district court, that Judge Cummings, who's taking senior status at the end of the year, doesn't understand copyright law at all. He has a fundamental misunderstanding of the entire realm of copyright law. That's not true. Judge Cummings went through, and the reason he was interested in who brought the design elements, who brought the creative elements out there, is because Judge Cummings was trying to get a handle on the license issue, trying to get an understanding of is this a non-exclusive situation where the builder comes in and says, I have a client, I have a project, I already have the design going, everything is in the works, I now need to start getting my concrete guy and my framework guy and my draftsman guy in on this project. I already have the design, I already know what I'm going to do. In that respect, who brings in the creative elements out there are very important. If you look at cases that came out like A.E. versus Shaver, if you look at cases like the Bourne versus Disney case, all of that was relevant to the license issue. He wasn't trying to say that ideas are protected under copyright. Well, the esteemed district court is not in trial here, so can you get to your – Sure. I appreciate you responding to a comment made by opposing counsel. Absolutely right. Can we hear about why your client is not responsible for any of these deeds? Sure, Your Honor. There's two types of copyright cases involving builders and architects generally.  or takes a plan and uses it multiple times and paying once. Those kinds of cases end poorly for builders. That's the Kip Flores case. That's the Penn Hollow case. There's another type of case where the builder is the genesis of the project. The builder is hired to develop a particular piece of property, and the builder brings in the design elements, the builder brings in everything to do with it, and at some point he hires a draftsman as a subcontractor and brings that draftsman to contribute to that project. Right, but the problem is here. He hired Hunn as the draftsman, not Lack. Right, Ben Lack was Mr. Hunn's employee. Right, so he might have been able to go on and finish his project. It's taking everything in your favor, not in the favor. He might have been able to finish his project with another draftsman using plans that were furnished to him, but could he use Mr. Lack, who has a proprietary relationship with Mr. Hunn? Yes, Your Honor, and the reason why is that as the court found, Mr. Dan Wilson Holmes had a license to use those plans and finish them. To use the plans, the paper plans they got, not to have Mr. Lack take AutoCAD software from his office or the files and manipulate on his home computer with stuff he had taken from his office. Explain that. Those plans are the exact same plans that had been delivered to Dan Wilson Holmes. But once they're put on AutoCAD, it's a manipulable form. They're in a different form that is proprietary to Hunn. Your Honor, AutoCAD is just a program that takes data and presents it. It's no different than if you had a manuscript on paper that was printed out from Word. Well, it's Word versus PDF. You can take the PDF version and do what you want from the last version you got, assuming that you do have some license to use it. But you can't take the Word embedded version that has all kinds of metadata and things and do what you want, and the AutoCAD does have the metadata. Your Honor, none of that was put into evidence on trial as to what was proprietary at all to Hunn. As a matter of fact, there's a specific finding from the court that all of that, how to use that, how to use that metadata, how to do all that, that Lack brought that from his prior employment, that Lack had that before he showed up and was hired by Hunn Designs. There's specific findings that there was zero training provided to Mr. Lack. There was specific findings that none of this software was provided to Mr. Lack. It was all his own. This was all what you're describing are all things that Mr. Lack brought before he was hired by Hunn Designs. He used to have his own business to do these things. Okay, but can you get me to the part where it's okay for Mr. Lack to go work with Wilson? Perhaps you want to save it for your other report. No, you're right. What happened with that is Mr. Wilson came in and offered four resolutions. What was talked about in this admission is a description of four resolutions described in paragraphs 20 through 22 of the findings of fact, four resolutions that were rejected by Mr. Hunn. Mr. Wilson said, please finish them, Mr. Hunn. He wouldn't do it. He said, retain Lack a few more weeks and finish them. Mr. Hunn wouldn't do it. He said, retain Lack as an independent contractor and finish them. He wouldn't do it. He said, okay, I'll pay you for what you've done and have somebody else finish it, have Lack finish it, and Marshall Hunn wouldn't do it. And he finally said, and this is something that was real important, a mischaracterization earlier. Mr. Wilson said, look, I'm going to get Mr. Lack to finish these because he's off on his own and he can do this, and I'm going to pay you the entire purchase price. The entire price is if you've done 100% of the work yourself, and you're going to put your stamp on it. It's going to have your copyright on it. And after I get done building these, they're yours. They're your designs. And Mr. Hunn replied and said he would not accept that. And that was specifically misrepresented a few minutes ago, but that was referred to. It's in the brief and on the record at Record Appeal 4701-04. Well, but to the extent that Mr. Lack can't work for Mr. Wilson because he has a non-compete, and Mr. Wilson was originally Mr. Hunn's client, how is Wilson exonerated? Mr. Wilson had, first of all, he had no idea whatsoever about the non-solicitation agreement until after the fact. That's been established. That was recognized by all parties. Okay. So, first of all, that happened. And second is there was a finding from the court, and the court examined this issue at length, that there wasn't a breach of fiduciary duty after employment because Mr. Lack had nothing that was confidential. He returned the paper files and all he had at home. The client name and the client project, it doesn't – he also had the AutoCAD version, which is manipulable, but he had the client name and the client project. Those are proprietary to the company. We do a lot of non-compete work in Texas courts, and non-compete work has gone way – it's changed the pendulum since Light and Sintel and Schesternhoff, and the pendulum is very different now. And that was proprietary information. I don't understand how it's not. So maybe I'll let the other counsel tell me why it's not. I think she's more prepared. My position is he didn't know about it. It's not much of my position. It's something that was found by the trial court. Okay. Can you help me with substantial similarity under copyright? They don't have to be identical, and so can you help me why they're not substantially similar? Absolutely, Your Honor. What you had, you had four plans that are at issue, and these are briefed heavily in the briefing where it goes through and takes the actual record and the side-by-side comparison that were done by both parties and looks at whether these items are similar or not. Now, first of all, there was never any testimony about what were the creative elements that were copied. That's first. But second, there was a long period of testimony, and like I said, it's in some pages of the brief. I don't know which page it is. There it is. It's on our response pages 39 through 43, and it goes to – I think you also have some boards that were marked up. They're going to be hard because they're not live. But do you agree that those things in the record excerpts are what I'm supposed to be comparing? Absolutely, Your Honor. And a quick comparison. The Brown plan was identical, but that plan was drawn by Mr. Greenstreet, who isn't here today, and that plan is owned by Dan Wilson Holmes. That plan, a builder in Lubbock brought the finished plans to Dan and said build this house, and then Marshall Hunt was allowed to make a copy, and then he registered Mr. Greenstreet to work. That was our counterclaim. So that one's not – that one was – does have substantial similarity, but it was our plan. The second one that was nearing completion was the McGee house. Mrs. McGee became Mrs. Winder. What happened is the same time that all this was going on and that her house was almost finished, she got married. She'd been before she had her husband – I mean, she'd been married, husband died, remarried, and she reworked her house to include her husband in there. And so that plan, even though it was near completion, was reworked and no longer substantially similar. That was explained in there, and Mr. Lack testified that, yeah, sometimes you have plans that are almost finished, something happens, and you go back to the drawing board. And the other two plans weren't even close. The Jeffers house was just an outline sketch, and all we had was a hand sketch for some ideas on the showcase home. And so there was a substantial similarity. Well, there's never going to be substantial similarity if you start off with just an outline, which I assume you ordinarily got from the draftsman, and then you finish the house. But aren't we concerned about whether what Wilson started with and used initially to begin the completion of the house was similar to what had been provided to him? Well, first of all, if there's not a license. I mean, there's a license issue first. But even on that, the derivative work issue depends upon it. I'm out of time, but I'll finish the question. It depends upon substantial similarity, and there has to be the creative elements that are copied into the new design. And there's a lot of cases out there that talk about when you're talking about a house, there's millions and millions of houses out there, and there's only so many places you put the garage and the master suite and whatever, so you can't look at the general arrangement of the rooms. You have to look at the creative elements within the design. There was no showing of those elements at trial, and we showed a lot of changes that had been made. Okay, thank you. All right, Ms. Hill. May it please the Court. My name is Elizabeth Hill, and I represent Ben Lack. I'd like to start off by diving into Judge Elrod's questions regarding non-compete law in Texas at this time. Here we have a non-solicitation agreement that was entered at the time of an at-will employment agreement, and looking at the face of the documents themselves, they're completely void of any consideration. Now, Hunt asked this court to imply consideration, as the Texas Supreme Court did in fielding, and look to the job duties that are identified for Lack, and Judge Cummings did just that in the summary judgment order, looking to those specific job duties. We have design. We also have a reference to the CAD computer system, and that seems to be the element of contention that Hunt relies on as a confidential element that allegedly Lack took away. But even in the language of the non-solicitation agreement, Hunt identified that as standard. In fact, Judge Cummings referenced that, Hunt could have drafted this at-will employment agreement in any manner, yet use standard CAD installation, and that while Lack may have some management of spec clients, just having mere contact with clients, mere contact with customers, rather than an entire customer list, that that by itself does not rise to the level of a trade secret. In fact, this court evaluated when you can imply consideration in a non-compete agreement in Raymart versus Stock Building Supply Company back in 2008, just a year before fielding, in fact. But the law has changed substantially since then, hasn't it, in Texas? It is true that the Texas Supreme Court has expanded the Covenants Not to Compete Act. That is absolutely true. However, this particular non-solicitation agreement is an example of a naked restraint on trade, and there are competing policy considerations in enforcing non-competes, and this is an example of when a non-solicitation is attempting to be enforced with no consideration. Okay, this is a rather bald non-compete violation, if it were in effect, though, isn't it? It's the very client. It's not some list you take and then you start cold-calling people later. This is the very client in an ongoing project on that particular project, so there's none of the defenses like, oh, we knew each other otherwise and this is a different project. If it's valid, it's a bald violation, isn't it? Your Honor, we disagree. We believe that Hunt did not protect any of the confidential information and that that is a customer list that Hunt expressly referenced in his deposition was not taken away by Lack, and the AutoCAD program, which is a program used and was already owned on Lack's own computer. He took the files from his work and didn't give them back when he left. He brought the hard copies back but didn't give the computer files that enabled, and that's undisputed. This is not a clearly erroneous situation. He took the files from his work, knew that he needed to give hard copies back, but surreptitiously kept the files on his computer so he could continue to work on the project, the very project that his employer had been hired to do. Your Honor, that is correct. However, Hunt testified at trial on page of the record 3997 through 3999 that he was well aware that Lack had files at home, that he definitely expected Lack to have those electronic files at home, that he knew that Lack had an older version of AutoCAD and that he had to convert those. In fact, in Hunt's deposition on page 37 of Hunt's deposition, he acknowledged that he had also emailed AutoCAD files to clients. How is that? I don't understand at all why that's relevant to him using the information to benefit his subsequent business in direct competition with his employer. You may have allowed your employee to take home all sorts of information, but if the employee, when he ceases being employed, uses it to directly compete with you, it doesn't mean that you authorized that or that that was a proper use of that information. Yes, Judge Elrod, but courts draw the line on finding a breach of fiduciary duty after post-termination of employment with confidential information and trade secrets. I'm still hung up on your non-compete. Certainly, and we can certainly... The two are very intertwined, and it really turns on the district court's factual determination that Lack never received any confidential information. So even if on the face, hypothetically, if this court were to find that the non-compete could be enforced, it never became enforceable because Hun never transferred confidential information to Lack. And the Texas Supreme Court has noted that a non-compete agreement, even if it's illusory at the time that it's entered, then it can become enforceable later. This never became enforceable because there was never that confidential information that was transferred to Lack. Hun never provided any conditions to those files when they were delivered to Wilson and other homebuilders and homebuyers on a weekly basis. He never asked any of those customers to sign a nondisclosure. They were not treated as confidential information or trade secrets. And that really is the line that courts should draw whenever finding a breach of fiduciary duty after employment. Now, certainly, had there been something before employment, that would be different, but the allegation is that this was used after employment. Well, the allegation is... We would have to find clearly erroneous here. The allegation is that he... Or perhaps one of the admissions, and we'd have to find that applies. The allegation is that he intended this while he was still working and that this was a scheme. So it's not true that this was just... The allegation is that it's after. The allegation is that it's before. But the judge, the court, found that it was after. That's absolutely correct, Judge Elrod. In fact, Judge Cummings noted in footnote 7 on page 9 of his opinion that he weighed the credibility of Lack's testimony concerning why he had these files transferred two days prior or a day prior to his termination and that he found his testimony credible, that Lack expected that he would continue on to be employed for two weeks and that during that time, he would be able to finish the plans for Wilson. If we find that there is a judicial admission that is contrary to a factual finding of the trial court, which controls? Well, Your Honor, here the court found consistent with the judicial admissions. That's not my question. If they are inconsistent, which controls as a matter of law or as a matter of evidentiary review by this court? Well, we would agree that if there is a finding of fact that is entirely inconsistent with a judicial admission and that it's not explained by some other reason, that that might be clear error. However, here, the findings of fact that Judge Cummings made were clearly consistent with the judicial admission because Lack admitted that the file was transferred, but the admission did not ask why. The admission did not ask for the purpose. And as this court noted in Navigant Consulting just a few years ago, that in evaluating and scrutinizing an employee's actions shortly prior to their departure, that those actions certainly can be shaded by that departure and that you have to look to the intent. And here, the district court did just that and found Lack's testimony credible. Now, in looking at the breach of fiduciary duty, Hunn relies on this court's decision in NCH Corporation v. Broyles dating back to 1985. And there, to compare the level of customer information that was taken by the employee in that case, there was a customer route list that included the customer's contact information, the orders that they had made, the frequency, the price list. And that customer and that employee took it away and then used it in competition. And here, this court did find that that was a breach of fiduciary duty. Why isn't this even more of an egregious breach in that it's not just a list of the customer? I mean, it's a direct contact, the name, the contact information, and the project itself. Here, because there was no confidential trade secret information that was taken away and then used against the former employer, it is not a breach of fiduciary duty because, as courts have noted, there must be an element of secrecy. And otherwise, if there is not, that fiduciary duty ends on the date that the employment terminates. Did Wilson tender to Hunn the amount of the job that he got right to do? Or did he offer to go ahead and pay Hunn anyway, even though Black was no longer working for him? Yes, Your Honor, Wilson attempted to pay Hunn at first the portion that he had completed and then attempted to pay him the entire amount, and Hunn rejected that. And as Judge Cummings noted, Hunn took a course of action to advance litigation, and that is where an inequitable nature was found and unclean hands. Why is that unclean? If you believe the person's breached and you don't want to accept the settlement, why isn't it actually indication that Wilson knew it was wrong? Because if he's just in a regular arm's-length relationship with the new drafter, why would he offer to pay Hunn for the work the drafter did? He wouldn't owe Hunn anything because he says he doesn't know about the non-compete and the non-solicitation. Why isn't that actually evidence that he knows that he's done something wrong? Here it was not, Your Honor. It was an attempt to avoid further litigation, to essentially avoid today. But it doesn't, it doesn't, it plays out either way. I mean, you can't say it's a good thing or a bad thing because it could be either. Well, here Judge Cummings weighed the credibility of the witness and determined that there were unclean hands, there was a motivation there to punish, essentially, Wilson and Lack for their conduct. Why is that unclean hands under the law to say I'm going to stand on my contract and enforce it to the ends of the earth? How is that... If you believe you have a contract, what case says it's unclean hands to say I'm not going to settle? Well, looking at the reality, Your Honor, and I see that I'm out of time if I may... You may answer the question. Looking at the reality of what Hunn wanted to have happen here, what Hunn wanted is for these homebuyers, who themselves had designed their homes, had brought magazine cutouts, had even brought their own drawings at times, Hunn wanted to hold those plans hostage. The homebuyers are not part of this contract. The contract is between Wilson and Hunn. So why is it unclean hands for Hunn to say I'm not going to take your settlement off or I'm not going to take your partial payment, I'm not going to take your full payment because you're working with my former employee and you're violating my contract? How is that unclean under the law? Well, and to clarify, Judge Elrod, Wilson approached Hunn first. Wilson approached Hunn first and laid out several options. How is not taking an option of unclean hand and saying no, I'm going to enforce my contract as written? Your Honor, Judge Cummings here found that conduct unreasonable and with the... What case supports that? That saying I'm going to stand on my contract to the ends of the earth is unclean hands. Your Honor, I don't have a case at this time if we could supplement or use that. Your Honors, for this reason, we would ask this court to affirm the district court's judgment. Okay, thank you. Back to you, Mr. Baker. I want to make two major points in rebuttal. The first point has to do with the suggestion that there were no trade secrets, no confidential information in this case. There was a lot of testimony, but Lack admitted at trial these AutoCAD files were kept under lock, key, and password, that Lack only got them because he was an employee. But the most important part on the confidentiality issue is we go back to judicial admissions. Paragraph 17 of Lack's second amended answer in this case says those files were, quote, all for the benefit of Han, close quote. Well, they were, but they were misappropriated and taken inappropriately. The second point I want to make is Judge Dase has suggested several times that if Han were offered full payment, why didn't he settle? Let me answer that question. Does an employer have to settle a case and put a former employee in competition with him? Does an employer have to settle a case unless someone infringes patents or copyrights? Does an employer have to settle a case for any purpose? This case was brought in this court, and we're asking for justice. We're not asking for settlement, and we want the full entitlement of damages under the Copyright Act and the breach of trust that Mr. Wilson participated in. We'll try to give you justice, Mr. Baker. Believe me, that's the business we're in. Your Honor, I kind of like Judge DeMoss. I don't hear very well. I'm sorry. The other thing I would like to go a little bit back to is this covenant not to compute because that's important. The Mann-Frankford case out of the Supreme Court of Texas says, Hey, there can be an implied promise to provide confidential information. Here, particularly for the circumstances of the job required. Here, Lack was hired to do drafting. He was hired to manage the CAD files, and he admitted he did it. Do we have to find that the district court was clearly erroneous in determining that there was no confidential information shared? I believe the court found that. Even though it's clearly admitted in this case that all of the AutoCAD files were continuously maintained on that computer, they could be only accessed by employees who used them only for the benefit of Hunt. They were under lock. They were under key. They were under password. You can't get a greater degree of secrecy. To the extent the court found that they were no longer secret and that they had been released into the world, is that a factual finding or is that some type of legal error? That is a clear legal error. Now, I'd like to go to that because that question really goes to a very strange point in intellectual property law. Often someone comes into court and says, Hey, I could have gotten the information. I could have read it out of this patent. I could have got it off this copyright. I could have got it anywhere. And then they say, and because I could have properly got it, that gives me a license to steal. It does not. You cannot breach a confidence and access somebody's computer to commit a fraud. To the extent the district court found that what was on the computer was no different than what was handed out at the meeting, is that a factual error or a legal error? That is a factual error, Your Honor. Weren't these drawings already released to Wilson? The paper drawings were. But the AutoCAD files, the files that you use that really facilitate AutoCAD design of a resident, they were never released. They were held under lock and key. And the judge found those? And that's what they took and used. The judge found those were substantially similar to the paper files. Well, he never saw those. Those weren't introduced into evidence. Did the judge find that? No, I don't believe he did. Why didn't you all introduce those into evidence? I'm sorry? Why didn't you introduce the AutoCAD files into evidence and argue they were different? Your Honor, we had admissions. And we had admissions that, hey, they were all for the benefit of HUD. Once you have these admissions, and that's another point about this case, we had discovery for over a year. We have all these requests for admissions. We have judicial admissions. And we get to trial, and it's a completely different story. And our point is that it just seems to me that the first thing a district court should do is to start off the findings of fact with what's conclusively established. But here we didn't have a single conclusively established fact in the file. We had new cases. I'm sorry, Your Honor. Thank you very much. Thank you. Thank you.